Filed 9/13/21 Marriage of Elliott CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re Marriage of LYNDA and MICHAEL ELLIOTT. | 2d Civil No. B304323 (Super. Ct. No. 17FL02195) (Santa Barbara County) |
| LYNDA ELLIOTT, Respondent, v. MICHAEL ELLIOTT, Appellant. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on August 24, 2021, be modified as follows:

On the caption page, appellant's name to be corrected from "MICAHEL" to "MICHAEL."

There is no change in the judgment.

Respondent's petition for rehearing is denied.

_____

GILBERT, P.J.          YEGAN, J.          PERREN, J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re Marriage of LYNDA and MICHAEL ELLIOTT. | 2d Civil No. B304323 (Super. Ct. No. 17FL02195) (Santa Barbara County) |
| LYNDA ELLIOTT,  Respondent,  v.  MICAHEL ELLIOTT,  Appellant. | |

Michael Elliott (Husband) and Lynda Elliott (Wife) were married in August 2003 and separated in August 2017. In its December 21, 2018 status only Judgment for Dissolution, the trial court ordered that one half of the parties' Vanguard IRA transferred to a rollover account in Wife's name.  On December 19, 2019, the trial court entered a judgment on reserved issues that, among other things, divided the parties' real estate.

Husband alleges the trial court erred when it denied his claims for reimbursement of his separate property in the Vanguard IRA and his separate property contributions to the parties' real estate. (Family Code, §2640.)[1]  The trial court concluded Husband failed adequately to trace his separate property contributions to these assets and denied all of his reimbursement claims.  Husband contends the trial court erred because his tracing was adequate. We agree and reverse.

FACTS

The parties met in 1995 and began living together in April 1996 when they moved into a house on West Street in Laguna Beach (West Street).  Husband purchased the West Street house by making the down payment of $51,500.  He held title to the property in his name, as a single man.  Wife testified that she made the down payment, that the parties had a joint bank account, and that they agreed they would share equally any assets acquired during their relationship.  The trial court rejected this testimony, crediting Husband's testimony on the issue instead.

In connection with a prior divorce, his 1997 divorce from his first wife, Husband received title to a house on Cebolla Street in Rancho Santa Margarita (Cebolla).  The house was rented out until it was sold in 2011.  In 2007, the parties refinanced this property, taking out cash to pay off the mortgage on another property.  The trial court found the Cebolla house became community property in this transaction.  Husband does not dispute the characterization.

---

[1] All further statutory references are to the Family Code, unless otherwise noted.

Husband next bought a house on National Park Drive in Laguna Niguel (National Park) in February 2003.  He made the down payment of $295,000 and took title to the property in his name, as "an unmarried man."  The parties moved into the National Park house in February and were married six months later, in August 2003.

In October 2004, after they were married, the parties sold the West Street house.  They used some of the proceeds in May 2005 to acquire a condominium (the Kazan Street property) in an exchange under section 1031 (section 1031) of the Internal Revenue Code.  (26 U.S.C. § 1031.)[2]  Husband took title to the Kazan Street property as a married man, as his sole and separate property.  In July, the parties used more of the proceeds from the West Street sale to purchase an office condominium in Mission Viejo (Chrisanta).  Husband and Wife took title to the Chrisanta property as joint tenants.  In 2007, Husband and Wife used jointly borrowed funds from a refinancing of Cebolla to pay off the loan secured by the Chrisanta property.

In 2008, the parties created the Elliott Family 2008 Trust and transferred title to the Cebolla, Chrisanta, Kazan and National Park Drive properties to the trust.  At that time, Cebolla and Chrisanta were already community property.  The trial court found the transfer to the trust also transmuted Kazan and National Park Drive from Husband's separate property to

---

[2] A section 1031 exchange allows "a taxpayer [to] defer taxes on gains from the sale of a property by using those gains to purchase a second property."  (*CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 780.)  These transactions typically occur through an intermediary that temporarily holds title to one or both of the properties and to the proceeds from the sale. (*Ibid*.)

community property. Husband does not dispute these characterizations.

In 2011, after the properties had been transferred to the trust, the parties sold both Kazan and Cebolla. Proceeds from the sales were deposited with an asset exchange company to facilitate section 1031 exchanges. The proceeds were later transferred to acquire a house on Windsor Way in Santa Barbara. In 2013, the parties sold the National Park Drive house and bought another house on Mission Ridge Road in Santa Barbara.

As a consequence of these transactions, the parties owned three pieces of real estate when they separated in 2017: Mission Ridge Road, Windsor Way and Chrisanta. Forensic accountant William Duerkson attempted to trace Husband's separate property to each of these assets. Because the parties had shredded older bank statements and other financial records before their move to Santa Barbara, Duerkson relied on grant deeds, deeds of trust, escrow closing statements, tax returns and his discussions with Husband to trace Husband's separate property from one property to another. Duerkson did not determine the source of the down payments Husband made on Cebolla, West Street and National Park Drive because those properties were purchased before the marriage and were titled as Husband's separate property. Instead, he treated each down payment as Husband's separate property and then attempted to trace that investment from the property originally purchased to a subsequently purchased property.

*Tracing Evidence*

Mission Ridge Road. Duerkson initially concluded that Husband's pro-rata separate property interest in the Mission Ridge Road house was 68% of its equity, or $504,025. He reached

4

this conclusion based on his understanding that funds for the down payment on the Mission Ridge Road house came from the sale of the National Park Drive house. Husband bought the National Park Drive house six months before the marriage, making the down payment of $295,000 and taking title in his name, as a single man. Duerkson did not determine the source of funds for that down payment. Community property was used to make the mortgage payments on the National Park Drive house.

The parties sold the National Park Drive house in October 2013, and deposited $641,625 in sales proceeds into a credit union account. Duerkson allocated 60% of the sales proceeds to Husband's separate property and 40% to community property. The parties' down payment on the Mission Ridge Road house was made in two installments, both withdrawn from the credit union account. Duerkson allocated the down payments first to Husband's separate property, and when that was exhausted, to community property. At the end of that process, Husband's separate property amounted to 68% of the equity in the Mission Ridge Road house, or $504,025. He acknowledged that, if community property was exhausted first, Husband's separate property interest in the house would be $291,296.

Chrisanta. The parties acquired the Chrisanta office condominium after they were married, in a section 1031 exchange. The down payment of $155,000 came from the sale of the West Street house. Duerkson allocated 85% of those funds to Husband's separate property. In 2007, Husband and Wife refinanced the Cebolla property, taking out $409,000 in cash. They used $281,014 to pay off the mortgage on Chrisanta. Duerkson allocated 72.5% of those proceeds to Husband's separate property and 27.5% to community property.

5

Windsor Way. The parties acquired Windsor Way in September 2011 by making a down payment of $272,000. Title to this property is in the names of both parties, as community property. Duerkson testified funds for the down payment came from a section 1031 exchange for Kazan Street and the remaining sales proceeds from Cebolla. Both sources were, in Duerkson's opinion, 100% Husband's separate property. Because community funds were used to pay closing costs and other acquisition costs, Duerkson concluded 7% of the down payment was attributable to community property. He assigned the remaining 93% to Husband's separate property. Duerkson concluded Husband's section 2640 reimbursement claim for Windsor Way was $251,261.

Wife disputed Duerkson's characterization of the various down payments and his allocation of the separate property and community property interests in each asset. She testified that both spouses contributed to the down payment on West Street and that their joint account paid some of the expenses associated with the Cebolla house.[3] In addition, in his answers to interrogatories, Husband described the West Street, National Park Drive, Chrisanta, and Kazan properties as having been "purchased by Lynda and Mike." Wife also noted that there were no bank statements tracing the source of the down payments on West Street, National Park or Chrisanta. In addition, funds from the sale of West Street and Kazan were deposited with an intermediary to facilitate section 1031 exchanges. Duerkson had no documentation from the intermediary indicating whether additional funds from community property sources were held in the intermediary's

---

[3] The trial court found this testimony not credible.

6

account or tracing specific funds from that account to specific assets.

Vanguard IRA. Before the marriage, Husband maintained an individual retirement account (IRA) at the investment firm Fidelity. Husband's forensic accountant, Duerkson, calculated that, in 2002, the Fidelity IRA had a fair market value of $52,087. Husband contributed an additional $34,606 to the account in 2002, creating a balance of $86,693. In 2003 and 2004, after the marriage, the parties contributed about $67,000 to the IRA. Husband transferred the IRA from Fidelity to the investment firm Vanguard in 2005. At that time, it had a value of $137,815. Another $4,500 was deposited to the account in 2008. There were no more contributions to the account. By the time the parties separated, the Vanguard IRA had earnings of about $359,000 and a total value of $502,000.

Duerkson allocated all of the contributions made before marriage to Husband's separate property and all of the contributions made after marriage to community property. He concluded that 56% of the IRA was Husband's separate property while 44% belonged to the community.

The trial court's December 2018 status only judgment of dissolution reserved jurisdiction over the division of property, and ordered the Vanguard IRA to be divided equally with Wife's portion transferred to a rollover IRA in her name. The judgment further notes this order was "issued to preserve the ability of [Husband] to defer distribution of his or her community interest on the death of the IRA owners." The trial court received no expert testimony or other evidence relating to the IRA before it entered the status only judgment. Duerkson testified at trial

that Husband was entitled to an additional $138,744 from Wife's rollover IRA, to reimburse his separate property.

The Statement of Decision and Judgment on Reserved Issues. The trial court issued a lengthy statement of decision which included its findings that the parties had no agreement to share property acquired before marriage and no joint bank account prior to marriage. The statement of decision also reflects the trial court's findings that Husband used his separate property to acquire various assets, and that he had a section 2640 claim for reimbursement of his separate property with regard to some of those assets.

The trial court's judgment on reserved issues states that its "factual and legal analysis is set forth in its Statement of Decision. The court denies [Husband's] Family Code section 2640 claims against the properties at [Mission Ridge Road, Chrisanta and Windsor Way]. The court also denies [Husband's] separate property allocation claim with respect to the Vanguard Rollover IRA . . . in [Wife's] name." The trial court awarded Chrisanta to Husband and Windsor Way to Wife. It ordered the parties to sell Mission Ridge Road with the proceeds to be evenly divided between the parties. The trial court left unchanged the equal division of the Vanguard IRA it had previously ordered.

DISCUSSION

*Contentions*

Husband contends the trial court erred when it denied reimbursement for his separate property contributions to the parties' real estate because those contributions were adequately traced to real estate owned by the parties when they separated. He contends the trial court erred when it denied reimbursement of his separate property contributions to the IRA

8

because the account was established prior to the marriage with his separate property and funds were not withdrawn from it.

Wife contends Husband's reimbursement claims relating to their real estate were properly rejected because Duerkson's tracing was incomplete. Among other things, Wife notes that Husband admitted in his discovery responses that West Street was "purchased by Lynda and Mike [in] 1995 prior to marriage," and that National Park Drive was "purchased before marriage by Mike and Lynda 2003." In addition, Husband provided no evidence tracing the source of the funds he used for the down payments on West Street and National Park Drive. Wife contends that funds borrowed in the 2007 refinancing of Cebolla should be treated as community property because both spouses were obligated on the loan. Husband's separate property cannot be traced to real estate purchased with those loan proceeds because all of the loan proceeds are community property. Husband also failed to exclude the possibility that other, community property funds were deposited with the section 1031 intermediary and used to make the down payments and principal payments on Kazan, Chrisanta and Windsor Way.

Wife contends the trial court correctly denied reimbursement from the Vanguard IRA because the status only judgment was final as to this asset. Alternatively, she contends Husband failed adequately to trace his separate property.

*Standard of Review*

Section 2640, subdivision (b) provides that, "unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the

9

extent the party traces the contributions to a separate property source." Reimbursement "is not limited to the specific property to which the separate property was contributed, but extends to 'any other community property that is subsequently acquired from the proceeds of the initial property, and to which the separate property contribution can be traced.' [Citation.]" (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057 (*Cochran*).)

Whether the separate property of a spouse has been adequately traced to a community asset is a question of fact for the trial court. We review the trial court's factual findings on that issue to determine whether those findings are supported by substantial evidence. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823.)

*Tracing Separate Property Contributions*

Tracing is an indispensable prerequisite to any reimbursement under section 2640. "[A] contributing spouse cannot randomly seek reimbursement from any asset through which his or her separate property contribution has at some time passed." (*In re Marriage of Walrath* (1998) 17 Cal.4th 907, 923 (*Walrath*).) The party seeking reimbursement has the burden to trace his or her separate property contributions to specific assets. (*Cochran, supra,* 87 Cal.App.4th at p. 1057.) Virtually any credible evidence may be used to establish the status of property as separate or community. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 91.) "[T]rial courts are free to consider and credit reasonable, well-supported, and nonspeculative expert testimony, when determining whether the proponent has successfully traced commingled assets to a separate property source." (*Id.* at p. 97.)

In *Walrath*, our Supreme Court held that a party's "entitlement to a separate property contribution reimbursement

10

is [not] limited to the original community property to which the contribution was made . . . ." (*Walrath, supra,* 17 Cal.4th at p. 913.)  Instead, when the original property is refinanced and the loan proceeds are used to "purchase or pay down the indebtedness on the original and other assets, the contributing spouse can trace the contribution to, and be reimbursed from," both the original asset and the newly acquired assets.  (*Ibid.*)

Here, the trial court's statement of decision found that Husband made separate property contributions to the community's acquisition of the Cebolla, West Street and National Park Drive properties.  With respect to each of those properties, the trial court also found that Husband had a claim under section 2640 for reimbursement.  Although it made factual findings that proceeds from the sale or refinancing of these properties were used to acquire new properties (Kazan, Chrisanta, Windsor Way and Mission Ridge Road), the trial court's judgment "denie[d] [Husband's] Family Code section 2640 claims" against those same properties in their entirety.  This was error.

Husband acquired Cebolla, West Street and National Park Drive before the marriage.  To the extent he made down payments on these properties prior to the marriage, the down payments were, by definition, made with his separate property.[4] (§ 770.)

---

[4] Husband acquired Cebolla during his first marriage and was awarded the property in the judgment of dissolution relating to that marriage.  The record contains no evidence regarding the amount or source of any down payment.  There is evidence that the property had a fair market value of $190,000 and secured debt of $195,000 when title was transferred to Husband.

11

In each instance, Husband took title to the property as a "single" or "unmarried" man. "The owner of the legal title to property is presumed to be the owner of the full beneficial title." (Evid. Code, § 662.) This presumption may be rebutted by clear and convincing evidence. (*Ibid.*) Here, the trial court expressly rejected Wife's testimony that the parties agreed "any real property purchased [before marriage] would be owned by both equally." The trial court found instead that, "Inadequate evidence was provided to support the existence of any agreement as to the . . . equality in ownership of real property purchased while cohabitating." In the absence of clear and convincing evidence to the contrary, the title presumption controls. Cebolla, West Street and National Park Drive were Husband's separate property until each property was transmuted to the community. (*In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 345, quoting *In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176,189, abrogated on other grounds by *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1405.)

The fact that these properties were recharacterized as community property through valid transmutations does not defeat Husband's reimbursement claim under section 2640; it is a prerequisite to that claim. As our Supreme Court explained in *Walrath*, "a reimbursement right under section 2640 only arises once the property becomes community property." (*Walrath*, *supra*, 17 Cal.4th at p. 920.) After transmutation from separate to community property, "section 2640 provides a right to reimbursement upon dissolution for the spouse who contributed separate property to [its] acquisition . . . ." (*In re Marriage of Weaver* (2005) 127 Cal.App.4th 858, 865.) "Commingling of separate and community property does not alter the status of the

12

separate property interest so long as it can be traced to its separate property source." (*Cochran, supra,* 87 Cal.App.4th at p. 1057.)

The question thus becomes whether Husband traced his separate property contributions from Cebolla, West Street and National Park Drive to Mission Ridge Road, Chrisanta and Windsor Way. The trial court rejected all of Husband's tracing evidence, finding that it was "incomplete" in unspecified respects and had unidentified "gaps." We conclude this was error.

<u>Mission Ridge Road</u>. In 2013, the parties sold their home on National Park Drive and used the proceeds to make the down payment on the house on Mission Ridge Road. It is undisputed that Husband purchased the National Park Drive house in 2003, six months before the marriage, taking title as "an unmarried man." The deed of trust and closing statement from that transaction document that Husband made a down payment of $295,000. By definition, the funds Husband used for the down payment were his separate property because they existed before the marriage. (§770.)

The trial court found that the parties sold the National Park Drive house in October 2013 and, "it does appear that funds from that sale were used to purchase Mission Ridge; however, the tracing is incomplete and community funds were available, as discussed below." It later noted, "While it is clear that some funds from National Park were utilized for the purchase [of the Mission Ridge house], there are gaps in the tracing (admitted by expert Duerkson at trial) that cause the court to characterize Mission Ridge as community property."

Duerkson relied on recorded deeds and the escrow closing statement to establish that Husband made a down

payment of $295,000 to acquire the National Park Drive house. Because the down payment was made prior to the marriage, those funds are Husband's separate property. Similar documents established that the 2013 sale of that property netted proceeds of $641,625. The parties deposited those proceeds into their credit union account and later withdrew $476,300 from the same account to make the down payment on the Mission Ridge Road house. This evidence adequately traced Husband's separate property contribution of $295,000 to the Mission Ridge Road house.

Chrisanta: At trial, Husband sought reimbursement for both the down payment made on the Chrisanta condominium and the $203,769 used to pay off the mortgage on this property. On appeal, Husband has abandoned his claim for reimbursement of the down payment and seeks reimbursement only for his separate property contribution to the funds used to pay off the Chrisanta mortgage. He contends these funds are his separate property because they were derived from the 2007 refinancing of Cebolla. The trial court denied Husband's section 2640 claim, reasoning "[t]he mortgage on Chrisanta was paid off near the time of the sale of Cebolla, so a complete and reliable calculation is not available. This incomplete evidence requires this property to be characterized as community property."

The characterization of Chrisanta as community property is necessary to Husband's reimbursement claim; it does not defeat the claim. (*Walrath*, *supra*, 17 Cal.4th at p. 920.) In addition, no substantial evidence supports the trial court's finding that the Chrisanta mortgage was paid off "near the time of the sale of Cebolla . . . ." To the contrary, the parties agree the mortgage on Chrisanta was paid off in 2007 and that Cebolla was

14

refinanced in 2007 and then sold in 2011.  The trial court failed to make any findings on the question of whether Husband adequately traced his separate property from Cebolla to the Chrisanta mortgage payoff.

Under *Walrath*, Husband is entitled to be reimbursed for separate property contributions he made to Cebolla if he adequately traces those contributions to cash received in the Cebolla refinancing and then to the repayment of the Chrisanta mortgage.  (*Walrath*, *supra*, 17 Cal.4th at p. 922.)  Duerkson determined that Husband's separate property contributions to Cebolla accounted for 72.5% of the loan proceeds received in the 2007 refinancing.  His conclusion that funds from the Cebolla refinancing were used to repay the Chrisanta mortgage was based on a settlement statement from the refinancing.  This document shows cash received by the parties from the new loan.  A handwritten note attached to the settlement statement reads, "paid off the office First Sec Thrift 281,014."  This note formed the basis for Duerkson's conclusion that funds from the Cebolla refinancing were used to pay off the Chrisanta mortgage.

The trial court made no findings on the question of whether this evidence adequately traced Husband's separate property contributions from the Cebolla loan proceeds to payment of the Chrisanta mortgage.  Consequently, we cannot infer findings in favor of respondent.  (Code Civ. Proc., § 634; *Ruiz v. County of San Diego* (2020) 47 Cal.App.4th 504, 521 (*Ruiz*).)  Failure to make findings on a disputed issue is reversible error.  (*Parker v. Contractors State License Bd.* (1986) 187 Cal.App.3d 205, 211 (*Parker*).)  We will remand the matter to permit the trial court to make findings on the adequacy of Husband's tracing and

15

the amount of any section 2640 reimbursement to which he is entitled.

        <u>Windsor Way</u>. The parties acquired the Windsor Way house in 2011, through a section 1031 exchange after selling the Cebolla house and the Kazan Street condominium. Because both Cebolla and Kazan were Husband's separate property before their transmutation, Husband contends he is entitled to reimbursement from equity in the Windsor Way property. The trial court rejected this claim, finding that the parties purchased Windsor Way "[as] an investment intended to benefit both parties. Title was taken by the parties as "community property with right of survivorship." [Exhibit 415] The court finds that the funds used for the purchase were commingled community and separate property funds, and the testimony of expert Duerkson did not adequately unravel them. The community had funds at the time that could have been used for the purchase, and community funds have been used for expenses [associated with the property]. The court finds that Windsor Way is community property."

        The characterization of the Windsor Way property as community property does not defeat Husband's claim for reimbursement; it is a prerequisite for the claim. (*Walrath*, *supra*, 17 Cal.4th at p. 920.) Similarly, the fact that separate and community property interests have been commingled in an asset does not defeat a reimbursement claim, if the separate property interest "can be traced to its separate property source." (*Cochran, supra*, 87 Cal.App.4th at p. 1057.) We understand the trial court's statement that Duerkson "did not adequately unravel" the separate and community property interests in Windsor Way to be a factual finding that Husband did not

16

adequately trace his separate property contributions from Cebolla and Kazan to Windsor Way. We conclude that finding is not supported by substantial evidence.

The cash used to make the down payment on Windsor Way came from the sale of Kazan and Cebolla, both of which were, at one time, Husband's separate property. Duerkson calculated the separate property and community property interests in each of these assets. He then relied on escrow closing statements, recorded deeds and tax returns to trace Husband's separate property from Kazan and Cebolla through the asset exchange company to the Windsor Way property.

Specifically, the seller's final settlement statement from the September 2011 sale of Kazan shows that sales proceeds of $306,525 were transferred to the asset exchange company, to facilitate a section 1031 exchange. That same month, the parties also sold Cebolla. Duerkson testified that $6,707 in net proceeds from the sale of Cebolla were also transferred to the asset exchange company. On September 7, 2011, $251,261 from the same asset exchange company was used to make the down payment on Windsor Way.[5] Duerkson established that the asset exchange company held proceeds from the sale of Kazan and Cebolla and then transferred those funds to make the down payment on Windsor Way. This testimony adequately traced Husband's separate property to Windsor Way. The trial court

---

[5] Husband's reimbursement claim decreased by about $20,000, from $272,000 to $251,261, because Duerkson reviewed a buyer's final settlement statement showing a payment that did not come from the intermediary. Duerkson assumed those funds came from the community, rather than Husband's separate property, because he could not trace the source of the funds.

17

erred when it rejected Husband's reimbursement claim based on inadequate tracing.

Vanguard IRA.  Before the marriage, Husband's IRA was in his name alone.  There is no evidence pre-marital contributions to the IRA came from any source other than his income.  Duerkson used account statements and tax returns to document contributions made to the IRA both before and after the marriage.  He presumed all contributions made before marriage were Husband's separate property and all contributions made after marriage were community property.  As a result of these calculations, Duerkson allocated 56% of the IRA to Husband's separate property and the remaining 44% to community property.  He allocated returns according to the same proportionate shares.

Duerkson concluded that, as of 2019, the balance in the Vanguard IRA was $501,451.  Based on his analysis of contributions made before and after marriage, Duerkson allocated $277,487 of the balance to Husband's separate property; the remaining $223,964 was allocated to community property.

In compliance with the status only judgment, one-half of the entire Vanguard IRA was transferred to Wife's rollover IRA.  Duerkson opined that Husband was entitled to reimbursement of his separate property interest, requiring a payment from Wife of $138,744.

The trial court's statement of decision did not mention the Vanguard IRA.  The judgment on reserved issues made no specific findings relating to the asset, except that it "denie[d] [Husband's] separate property allocation claim" with respect to the rollover IRA in Wife's name.

18

Husband contends the trial court erred because it failed to make any factual findings on his claim that he was entitled to a reallocation of the Vanguard IRA to account for his separate property interest.  Wife contends the status only judgment was a final decision on the division of the IRA.  Alternatively, she contends Husband failed to prove the amount of his separate property.

We reject Wife's contention that the status only judgment finally determined her interest in the Vanguard IRA.  The judgment expressly states that the court reserves jurisdiction over the division of property and that it divided the IRA to "preserve the ability of [Husband] to defer distribution of his or her community interest on the death of the IRA owner."  The status only judgment was not a final judgment on the division of the Vanguard IRA.

We further conclude the trial court erred when it failed to make findings regarding Husband's separate property contributions to the Vanguard IRA.  (*Parker*, *supra*, 187 Cal.App.3d at p. 211.)  Because the trial court made no express factual findings on this issue, we cannot infer facts in support of the judgment.  (Code Civ. Proc., § 634; *Ruiz*, *supra*, 47 Cal.App.4th at p. 521.)  We will remand the matter to permit the trial court to make findings on Husband's separate property interest in the Vanguard IRA and the appropriate division of that account.

## DISPOSITION

The judgment on reserved issues is reversed with respect to the Mission Ridge Road, Windsor Way and Chrisanta Drive properties and the Vanguard IRA.  On remand, the trial court is instructed to calculate the parties' separate property and

19

community property interests in these assets and to award section 2640 reimbursement consistent with this opinion. Appellant is awarded his costs on appeal.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P. J.


PERREN, J.

20

Colleen K. Sterne, Judge

Superior Court County of Santa Barbara

_____

California Appellate Law Group, Charles Kagay and Robert A. Roth, for Appellant.

Griffith & Thornburgh and John R. Rydell II, for Respondent.